**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

| | | |
|---|---|---|
| **McDAIN GOLF CENTER OF MONROEVILLE, L.P.,** | : | Bankruptcy No. 04-28843 BM |
| | : | |
| **Debtor** | : | Chapter 11 |
| *********************************** | | |
| **McDAIN GOLD CENTER OF MONROEVILLE, L.P.,** | : | |
| | : | |
| **Movant** | : | |
| | : | |
| v. | : | Doc. # 123: Debtor's Objection |
| | : | To Claim No. 8 |
| **FINANCIAL FUNDING GROUP,** | : | |
| | : | |
| **Respondent** | : | |

Appearances:   David K. Rudov, Esq. for Debtor
John P. Vetica Jr., Esq., for Financial Funding Group

**MEMORANDUM OPINION**

Financial Funding Group has filed a proof of claim in the amount of $87.500. Financial Funding claims it earned the fee in obtaining a financing commitment for debtor McDain Golf Center.

Debtor has objected to the proof of claim. Debtor asserts that Financial Funding failed to perform and denies that it prevented Financial Funding from doing so.

Financial Funding maintains that it fully performed its obligation to obtain such funding for debtor. To the extent that it failed to fully perform, Financial Funding asserts that debtor prevented it from doing so.

Debtor's objection to the proof of claim of Financial Funding will be sustained.

## – FACTS –

Debtor operated a golf shop, driving range and restaurant on a 27.5-acre tract of land it owned in Monroeville, Pennsylvania. Michael Vuick was manager of debtor.

Debtor, which began operating in February of 1990, leased the property to another operator in 1996. It regained possession of the property in December of 2000, after the lessee of the property at the time went into bankruptcy and rejected the lease.

Deciding that it needed to upgrade the facility and increase its revenues by opening a restaurant on the premises, debtor obtained financing from various lenders, all of whom were granted mortgages on the property.

When debtor eventually defaulted on the loans, one of the mortgagees commenced a foreclosure proceeding and obtained a judgment in March of 2004. The property was scheduled to be sold at a sheriff's sale on June 7, 2004.

Seeking to stave off the impending sheriff's sale, Vuick contacted Financial Funding for assistance in obtaining financing from a new lender. Greg Manifesto is the principal and sole owner of Financial Funding.

Vuick, on behalf of debtor, and Manifesto, on behalf of Financial Funding, executed two separate agreements on April 26, 2004. One of the agreements was captioned "Consult*ant* Agreement", the other "Consult*ing* Agreement". Why they executed two separate agreements is not apparent from the record.

Both agreements provided that Financial Funding was entitled to a fee for any financing debtor obtained through the efforts of Financial Funding. The "Consultant

Agreement" required debtor to pay a "consulting fee" equal to 3.5% of any financing "provided, facilitated or arranged" by Financial Funding. The "Consulting Agreement" provided that Financial Funding was entitled to a "funding success fee" in an amount equal to 3.5% of any financing "secured" through its efforts or through any referral it made.

The two agreements differed in one respect that transcends mere differences in terminology. The "Consultant Agreement" provided that the "consulting fee" was earned upon debtor's acceptance of a commitment to provide financing. The "Consulting Agreement" provided that in the event Financial Funding secured financing for debtor and debtor failed or refused to close or continue with the transaction after receiving such a commitment, debtor agreed to pay the agreed-to fee to Financial Funding.

Through the efforts of Financial Funding, debtor applied for financing from two prospective lenders and remitted checks to them to cover due diligence costs. Each rejected debtor's application and returned the checks to debtor instead of cashing them.

Also through the efforts of Financial Funding, debtor applied for financing from G&G, a private lender based in Virginia. In response to debtor's request for financing, G&G prepared a proposed term sheet on May 28, 2004. The term sheet proposed a loan in the amount of $2,500,000 with an interest rate of 12% *per annum*. The term of the proposed loan was for twelve months, with a possible extension of the term for an additional twelve months. The loan would be secured by a first mortgage on debtor's real property.

The proposed term sheet had the word "DRAFT" prominently written diagonally across each page. The line for G&G's signature also had the word "DRAFT" written on it.

Desperate to avoid the sheriff's sale which was set to take place in less than two weeks, Vuick signed the term sheet on behalf of debtor.

G&G did not require debtor to remit a check to cover its due diligence expenses in evaluating debtor's loan application. In addition, debtor never received a copy of the term sheet signed on behalf of G&G. As far as can be determined, G&G never signed the term sheet.

At debtor's request, the sheriff's sale scheduled for June 7, 2004, was postponed for a month.

Shortly after Vuick executed the above draft term sheet, Manifesto informed Vuick that the principals of G&G wanted to meet Vuick in person before committing to the loan. When Manifesto informed Vuick about the meeting, Vuick told Manifesto that he could not leave for Virginia at the time suggested by Manifesto due to another commitment and asked if the meeting could be postponed for a while. Manifesto retorted that one of the principals would not be available to meet with Vuick unless they went to Virginia forthwith.

Perturbed by Manifesto's response and thinking that he sounded "like a used car salesman", Vuick concluded that Manifesto was not "the guy to go with" in seeking financing and ceased dealing with Financial Funding from that time forward. Debtor never received a funding commitment from G&G.

Financial Funding sent a letter to debtor dated June 28, 2004, demanding payment of a consulting fee in the amount of $87,500, an amount equal to 3.5% of the loan amount set forth in the term sheet Vuick had signed on debtor's behalf. The letter angrily asserted

that Financial Funding had "made arrangements" for a loan in the amount of $2,500,000 and that "one of the conditions of the loan" was that Vuick personally "meet with the investors". Vuick's refusal to meet with G&G's principals, the letter continued, was in violation of their agreement, "thereby making it impossible to secure the loan".

On the eve of the sheriff's sale and with no financing in hand, debtor stayed the sale by filing a voluntary chapter 11 petition on July 6, 2004.

The schedules accompanying the petition listed assets with a total declared value of $5,067,950.00 and liabilities totaling $3,584,236.84. The above real property was listed as having a value of $5,000,000.00 and as subject to three mortgages totaling $2,118,000.00. Financial Funding was not listed as having any claim against the estate, disputed or otherwise.

On September 3, 2004, Financial Funding filed a timely proof of claim in the amount of $87,500.00 for "services rendered". Attached to the proof of claim was a copy of the above letter dated June 28, 2006, and a copy of the "Consultant Agreement".

Debtor's second amended plan of reorganization, which was to be implemented by the sale of the above 27.5-acre tract of land, was confirmed on June 24, 2005. The confirmation order provided that this court retained jurisdiction to hear and decide any matters arising from the implementation of the order.

Subsequent to confirmation of its second amended plan, debtor objected to the proof of claim of Financial Funding. Debtor denied that it owed an obligation to Financial Funding "for any amount".

An evidentiary hearing was held on debtor's objection to the proof of claim of Financial Funding. The matter is now ready for decision.

## – ANALYSIS –

A creditor in a bankruptcy case may file a proof of claim. 11 U.S.C. § 501(a). Unless a party in interest objects, a proof of claim so filed is deemed to be allowed. 11 U.S.C. §502(a).

The burden of production lies with different parties at various stages when, as here, there is an objection to a proof of claim.

The initial burden lies with the claimant, which must allege sufficient facts in the claim itself to support it. If the claimant does so, the claim is *prima facie* valid. *In re Allegheny International, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

The burden then shifts to the objector to come forward with evidence which, if believed, would defeat at least one of the essential elements of the claim. *Id.*, 954 F.2d at 173-74.

If the objector comes forward with such evidence, the burden shifts back to the claimant to produce evidence which proves the validity of the claim by a preponderance of the evidence. *Id.*, 954 F.2d at 174. Whereas the burden of production shifts back and forth, the burden of persuasion does not; it remains with the claimant at all times. *Id.*

Strictly speaking, Financial Funding's proof of claim is not *prima facie* valid. In addition to the latter dated June 28, 2004, in which it demanded payment of the fee,

Financial Funding attached a copy of the "Consultant Agreement" to its proof of claim. This agreement does not support the proof of claim.

The final paragraph of the "Consultant Agreement" provides that a consulting fee is "earned upon the acceptance of the commitment by the Client". It is not disputed that debtor never accepted any commitment from G&G to provide financing. It instead "walked away" when Manifesto told Vuick that a principal of G&G would not be available to meet Vuick unless Vuick accompanied Manifesto to Virginia at that time.

We will not, however, base our decision in this matter on this deficiency. Perhaps realizing that it had erred by attaching the "Consultant Agreement" to its proof of claim, Financial Funding instead relied upon the "Consulting Agreement" at the evidentiary hearing on debtor's objection to Financial Funding's proof of claim. This latter agreement provided that Financial Funding was entitled to a fee when it secured financing, without regard to whether debtor proceeded to close on the loan. It is preferable, when possible, to resolve an objection to a proof of claim on the merits.[1]

Proceeding to the next stage of our analysis, we conclude that debtor met its burden of going forward by pointing to the "Consultant Agreement". According to this agreement, Financial Funding's entitlement to a fee is contingent upon debtor's *acceptance* of a financing commitment secured by Financial Funding. Such acceptance never was given. If the "Consultant Agreement" is relied upon, it could be concluded that debtor's objection to the proof of claim by Financial Funding should be sustained.

---

[1.] Moreover, debtor did not see fit to contest the *prima facie* validity of Financial Funding's proof of claim. It instead challenged the proof of claim on the merits.

It remains to be determined whether Financial Funding has established, by a preponderance of the evidence, that it is entitled to payment of the fee it requests.

Resolving this question requires us to formulate the issues raised by debtor's objection to Financial Funding's proof of claim.

Debtor asserts that Financial Funding failed to perform and consequently is not entitled to the fee it requests. According to debtor, Financial Funding did not secure a commitment from G&G to provide financing for debtor. If Financial Funding did indeed perform and secured such a commitment, debtor points to the "Consultant Agreement" and asserts that it did not accept such a commitment from G&G and consequently is not obligated to pay the requested fee.

Financial Funding, on the other hand, maintains that it is entitled to the fee because it successfully performed by obtaining a funding commitment for debtor from G&G. Relying on the "Consulting Agreement", Financial Funding asserts that it therefore is entitled to the fee without regard for whether debtor accepted the commitment and closed on the loan. If it failed to perform, Financial Funding continues, debtor prevented it from doing so because Vuick "walked away" after refusing to travel to Virginia to meet with the principals of G&G at the time Manifesto insisted he do so.

These competing positions raise three issues: (1) whether Financial Funding performed all of its obligations under its agreement with debtor; (2) if Financial Funding did not fully perform, whether debtor prevented Financial Funding from doing so; and (3)

whether the "Consultant Agreement" or the "Consulting Agreement" controls in this instance. We will address these issues *seriatim*

### (1) Did Financial Funding Fully Perform?

Financial Funding is entitled to a fee under either of the above agreements only if it secured a financing commitment for debtor. The agreements have that much in common.

When a party to a contract seeks to enforce the contract or to recover damages for its breach by another party to the contract, the former generally must prove that it performed all of its obligations arising under the contract. *Trumbull Corp.* v. *Boss Construction, Inc.*, 801 A.2d 1289, 1292 (Pa. Cmwlth. 2002). If a party is not able to perform its obligations, it is not entitled to relief. *Empire Properties, Inc. v. Equireal, Inc.*, 449 Pa. Super. 476, 491, 674 A.2d 297, 305 (1996).

The evidence submitted in this matter leads us to conclude that, contrary to Financial Funding's assertion, it did *not* perform by obtaining a financing commitment for debtor from G&G.

Financial Funding's heavy reliance up[on the term sheet Vuick signed on May 28, 2004, is misplaced. The word "DRAFT" was prominently printed diagonally on each page of the document. Even the signature line at the end of the document for G&G had the word "DRAFT" written on it. This indicates that the document Vuick signed was merely a preliminary financing proposal by G&G. G&G did not intend when it prepared the document to lend money to debtor according the terms contained therein. Vuick signed

the term sheet even though it was only a draft out of desperation to avoid the impending sheriff's sale. Signing the draft term sheet, Vuick hoped, would expedite the process of obtaining a loan from G&G.

In addition, debtor never received a copy of the term sheet which was executed by G&G. Had the term sheet amounted to a commitment on the part of G&G, we would expect G&G to execute it. Nothing in the record indicates that the negotiations with G&G ever reached that point. They were preliminary at best.

Finally, G&G's insistence on meeting Vuick in person undercuts the contention that G&G had committed to making a loan to debtor and that Financial Funding consequently had performed under its agreement with debtor. Manifesto testified that the principals of G&G wanted to meet Vuick in person so they could "size him up". The loan commitment by G&G still was up in the air.

We conclude in light of the foregoing that Financial Funding did not perform its obligation obtain a financing commitment for debtor.

**(2.) *Did Debtor Prevent Financial Funding From Performing?***

In response to a query by the court at the conclusion of the evidentiary hearing, Financial Funding stated that debtor's objection to its proof of claim should be overruled because debtor did not "cooperate" with Financial Funding. In its letter dated June 28, 2004, Financial Funding accused debtor of "a lack of cooperation". We understand Financial Funding to mean by its response that debtor *prevented* it from performing when Vuick refused to meet with the principals of G&G.

- 10 -

It is a long-established principle under the law of Pennsylvania that when one party to a contract unilaterally prevents performance by another party to the contract of a condition upon which the former party's liability depends, the former party may not capitalize on the failure of the other party to perform. *Apalucci v. Agora Syndicate, Inc.*, 145 F.3d 630, 634 (3d Cir. 1998). The culpable party may not take advantage of the other's failure to perform and thereby avoid performing his own obligations. *Rainier v. Champion Container Co.*, 294 F.2d 96, 103 (3d Cir. 1961). This principle is rooted in "fundamental justice". *Borough of Nanty-Glo v. American Surety Co. of New York*, 316 Pa. 408, 411-12, 175 A. 536, 537 (Pa. 1934); *Miles v. Metzger*, 316 Pa. 211, 217, 173 A. 285, 287 (Pa. 1934).

Manifesto testified, in our estimation credibly, that it was the practice of the principals of G&G to meet *vis-à-vis* with a potential borrower before they would make a commitment to lend money to the potential borrower. G&G, in other words, would make such a commitment *only if* its principals met first with the potential borrower. By not meeting with the principals of G&G, Vuick failed to comply with a necessary condition for obtaining the desired financing.

While it true that debtor "refused to cooperate" with Financial Funding in this respect, we are *not* willing to infer from this alone that debtor unilaterally "prevented" Financial Funding from performing and consequently cannot escape liability for the fee Financial Funding requests in this proceeding.

The above long-established principle, it was noted, is rooted in "fundamental justice", *Borough of Nanty-Glo*, 316 Pa. at 411-12; *Miles*, 316 Pa. at 173. In our estimation, "fundamental justice" requires more in this instance than proof that debtor failed to satisfy a necessary condition for obtaining a financing commitment when Vuick did not meet with the principals of G&G. It also requires proof that *if* Vuick had met with the principals of G&G, Financial Funding would have succeeded in obtaining a financing commitment for debtor from G&G.[2]

Finding debtor liable for the fee Financial Funding requests without proof that *if* Vuick had met with the principals of G&G debtor would have obtained a financing commitment from G&G would offend "fundamental justice". Such a result would hold a party to a contract liable for failing to comply with a requirement when such compliance would be to no avail.

Financial Funding, which has the burden of persuasion with respect to its proof of claim, has failed to prove this proposition by a preponderance of the evidence.

The sole evidence offered in support of this proposition was provided by Manifesto. As we understand his testimony, Manifesto stated that had Vuick met with G&G's principals, Financial Funding would have succeeded in obtaining a financing commitment for debtor from G&G.

His testimony concerning this matter was self-serving and was not corroborated by any other evidence. We are not inclined on the basis of Manifesto's testimony alone to

---

[2.] Stated succinctly, "fundamental justice" would require proof in this instance that debtor would have obtained such a commitment from G&G *if and only if* Vuick had met with its principals.

conclude that debtor would have obtained a financing commitment from G&G if Vuick had met with its principals. Manifesto's testimony concerning this matter might have had considerable weight had Financial Funding elicited corroborating testimony from someone associated with G&G. No such testimony, however, was offered.

We conclude in light of the foregoing considerations that debtor did not prevent Financial Funding from performing and consequently is not liable for the fee Financial Funding requests.

**(3.) Which Of The Agreements Controls Here?**

For reasons that are not apparent from the record, debtor and Financial Funding executed a "Consultant Agreement" as well as a "Consulting Agreement" on April 26. 2006.

The agreements appear to be irreconcilable in one respect. The "Consultant Agreement" provided that Financial Funding was entitled to a fee upon debtor's acceptance of a commitment to provide financing for debtor. The "Consulting Agreement", by contrast, provided that Financial Funding was entitled to a fee in the event Financial Funding secured such a commitment even if debtor failed to close on the commitment. The fee, in other words, was owed without regard to whether debtor accepted the commitment.

We need not address and decide which of these apparently irreconcilable agreements ought to apply here. For Financial Funding to be entitled to a fee *under either agreement*, Financial Funding must have performed by obtaining a financing commitment for debtor *or* was prevented from doing so because of conduct by debtor which prevented

it from performing.  We have determined that neither of these disjuncts is satisfied in this instance.

An appropriate order shall issue.

                                                /s/
                            **BERNARD MARKOVITZ**
                            U.S. Bankruptcy Judge

Dated: **August 2, 2006**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| **McDAIN GOLF CENTER OF MONROEVILLE, L.P.,** | : | Bankruptcy No. 04-28843 BM |
| | : | |
| **Debtor** | : | Chapter 11 |

*******************************

| | | |
|---|---|---|
| **McDAIN GOLD CENTER OF MONROEVILLE, L.P.,** | : | |
| | : | |
| **Movant** | : | |
| | : | |
| v. | : | Doc. # 123: Debtor's Objection |
| | : | To Claim No. 8 |
| **FINANCIAL FUNDING GROUP,** | : | |
| | : | |
| **Respondent** | : | |

## ORDER OF COURT

**AND NOW**, this **2nd** day of **August**, 2006, it hereby is **ORDERED, ADJUDGED** and **DECREED** that debtor's objection to Proof of Claim No. 8 filed by Financial Funding Group be and hereby is **SUSTAINED**.

It is **SO ORDERED**.

/s/
**BERNARD MARKOVITZ**
U.S. Bankruptcy Judge

cm:   David K. Rudov, Esq.
John P. Vetica Jr., Esq.
Gregory F. Manifesto, President of Financial Funding Group
Office of United States Trustee